LARRY J. NORRIS, APPELLEE AND CROSS-APPELLANT, V. IOWA BEEF PROCESSORS, INC., APPELLANT AND CROSS-APPELLEE, STATE OF NEBRASKA, SECOND INJURY FUND, APPELLEE AND CROSS-APPELLEE.

402 N.W.2d 658

Filed March 13, 1987.   No. 86-159.

Wayne E. Boyd of Smith & Boyd, for appellant.

Dennis J. Mahr, for appellee Norris.

Robert M. Spire, Attorney General, and John R. Thompson, for appellee Second Injury Fund.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Iowa Beef Processors, Inc., now IBP, inc., appeals the award obtained by Larry J. Norris in the Nebraska Workers' Compensation Court. Also, the Nebraska Workers' Compensation Court dismissed the action against the State of Nebraska, Second Injury Fund, impleaded by IBP. Norris cross-appeals on issues regarding the degree of Norris' permanent disability determined by the Nebraska Workers'

Compensation Court, and compensation from the Second Injury Fund. We affirm.

In his petition Norris alleged that as a result of his employment at IBP, he had sustained bodily injuries, and sought compensation for injuries to his legs, shoulders, right arm, and back. IBP filed a "claim against the Second Injury Fund," and the State of Nebraska, Second Injury Fund, was impleaded in the action.

Born on March 23, 1949, Larry Norris, at age 4, sustained accidental injury to his right eye and, since age 7, has had a prosthesis in his right eye socket. Norris has corrected vision in his left eye but has some trouble with peripheral vision in that eye. On account of Norris' loss of sight in the right eye, some prospective employers declined to hire Norris at the risk of possible total blindness resulting from employment. In his written application to IBP for employment in 1976, Norris stated: "I'm blind in my right eye." Similar statements about the absence of sight in Norris' right eye appear in other records of IBP, establishing IBP's knowledge of the disability when IBP hired Norris.

From 1978 through the fall of 1983, IBP employed Norris as a "beef lugger," a job which required Norris to unload trucks and carry quarters of beef which had an average weight of 185 pounds. The lightest pieces of beef weighed 135 pounds, and the quarters had a normal maximum weight of 235 pounds. Norris carried an average of 480 pieces of beef per day, thus daily bearing an average weight of more than 88,000 pounds of beef. While a truck was being unloaded, "fronts" of beef dropped a distance of 2 feet from the delivery truck onto Norris' shoulders. Occasionally, workers slipped and fell on the plant floor, which was slick with animal fat and blood.

In 1980, Norris slipped and fell at IBP, underwent six separate surgical procedures on his knees (three procedures on each knee), and eventually required a patellectomy (removal of kneecap) of his right knee in 1984. Norris also suffered a carpal tunnel syndrome (nerve entrapment at the wrist or elbow) in his right arm, restricting mobility and repetitive work involving Norris' right arm.

As a consequence of his employment at IBP, Norris sustained

various bodily injuries resulting in his inability to be on his feet for any prolonged duration; shoulder problems experienced when Norris pushed or reached with his arms; inability to lift more than 40 pounds; limitations in pushing and pulling leg controls on machinery or equipment; and general difficulty in squatting and crawling or climbing stairs. Loss of sight in the right eye never interfered with Norris' job at IBP.

Since 1981 Dr. John J. Dougherty, an orthopedist, has treated Norris' various injuries. Dr. Dougherty expressed his opinion that Norris has sustained permanent partial disability in five areas on account of injuries sustained at IBP, namely, disability of 1 percent of the right arm, 20 percent of the right knee, 5 to 10 percent of the left knee, and 1 to 2 percent in each shoulder. Referring to the American Medical Association, Guides to the Evaluation of Permanent Impairment (2d ed. 1984), and as an additional evaluation based on the five separate areas of Norris' disability, Dr. Dougherty extrapolated percentages of permanent disability to Norris' body as a whole. According to Dr. Dougherty, Norris sustained the following permanent partial disability to the body as a whole: 1 percent as the result of the arm injury; 8 percent from injury to the right knee; 4 percent on account of injury to the left knee; and 1 percent attributable to each shoulder injury. Dr. Dougherty further extrapolated Norris' disabilities and expressed an opinion that, as an overall disability or combined value of permanent disabilities or impairment, Norris had sustained 36 percent disability of the body as a whole, that is, 24 percent for the loss of sight in the right eye and 12 percent attributable to the other disabilities to Norris' body as a whole.

Additional evidence from Dr. Dougherty unfolded as follows:

Q. . . . Let's just take a situation where physically he doesn't have any problems with his knees, shoulders, back or right arm. He just has the lost right eye. Add to that the problems you have indicated with those — the knees, shoulders, back and right arm. Would the combined disability of all of those be greater than it would before he had the problems — the other physical problems? Would it increase his disability by virtue of the back, knee, so on?

A. I don't think so. I mean, I'm not sure I quite understand. Are you saying that would he be worse because he has got the eye or not worse?

Q. Yes.

A. I don't think so.

Q. You don't think the eye contributes anything to it?

A. No.

Dr. Dougherty further testified that Norris had no "significant disability" of his back.

Norris hired Karen L. Stricklett, a rehabilitation professional certified in rehabilitation counseling, to assess Norris' employability in view of his several injuries. Stricklett testified that, assuming Norris had no disabilities and based upon his education (high school) and work history, Norris would be able to perform approximately 47 percent of the jobs available in the national economy. In Stricklett's opinion, when all disabilities of Norris are considered cumulatively, Norris would have approximately a 68-percent loss of access to the labor market, meaning that Norris was able to perform only 15 percent of the jobs in the national economy. If Norris' disability consisted only of the loss of vision, Norris would experience a 28-percent decrease in employment options. When asked whether the loss of Norris' right eye, combined with his other injuries, would be an obstacle in obtaining employment, Stricklett answered: "I feel that it would affect it to some extent." Concerning the effect of Norris' disabilities upon his earning capacity, Stricklett expressed: "[I]t certainly appears that Mr. Norris' job options as well as his earnings potential have been affected by his numerous injuries at Iowa Beef Processors." However, Stricklett never offered a comparative evaluation of Norris' employability, that is, employability in view of all Norris' permanent disabilities compared with Norris' employability which would have resulted from the injuries at IBP, considered alone and apart from the loss of sight in Norris' right eye.

Norris received a vocational rehabilitation evaluation by the State of Iowa. Although blindness in the right eye was listed as one of Norris' disabilities, the Iowa report stated: "Disability wise, the the [sic] back, knees will probably not be plus's [sic] in

the Industrial area." The Iowa report made no mention that Norris' lack of sight in the right eye would be a hindrance to employment, but stated that "the problem which interfered with the area evaluation projects was carpal tunnel syndrome. . . . We were unable to identify problems specifically resulting from the blindness."

On rehearing, the three-judge panel found that Norris had sustained a 20-percent permanent partial disability to his right leg, a 10-percent permanent partial disability to his left leg, a 1-percent permanent partial disability to his right arm, and, as a consequence of the shoulder injuries, a 5-percent permanent partial disability to Norris' body as a whole. The Workers' Compensation Court found that Norris had failed to prove any disability to his back and denied recovery referable to the back problem alleged by Norris. The Nebraska Workers' Compensation Court ordered payment of weekly benefits, as well as payment of medical and hospital expenses, and determined that Norris was entitled to vocational rehabilitation.

In denying the claim against the Second Injury Fund, two members of the panel (one judge dissenting) stated:

> While it is true that the plaintiff has vision in one eye only, and that this has been true during the whole of his employment by the first named defendant and was reflected on the plaintiff's application for employment with the first named defendant, the Court does not believe that the degree or percentage of disability suffered by the plaintiff today is substantially greater than that which would have resulted from the knee, shoulder and arm injuries considered alone and of themselves.

In his dissent, one judge expressed:

> Translating each of the injuries into whole body impairments, all of which are charged to Iowa Beef Processors, Inc., other than the loss of the eye, the defendant Iowa Beef Processors, Inc., would pay 42.8 per cent of the total disability compensation and the Second Injury Fund would pay 57.2 per cent.

Apparently, the dissenting judge in the compensation court, while agreeing with the other judges in a finding of 5 percent

disability to Norris' body as a whole on account of the shoulder injuries, used the sum of Dr. Dougherty's extrapolated percentages of disability to Norris' body as a whole (arm—1 percent, legs—12 percent, and eye—24 percent) in determining disability to Norris' body as a whole, arriving at 42 percent disability of the body as a whole. Based on the ratio between Norris' loss of sight (24 percent) and the cumulative disability to the body as a whole (42 percent), the dissenting judge apportioned payment of Norris' weekly benefits, that is, 42.8 percent to IBP and 57.2 percent to the Second Injury Fund. Because the majority of the compensation court had concluded that Norris' combined disabilities (nonindustrial and industrial accidents) were not substantially greater than the disability from Norris' injuries at IBP considered by themselves, the compensation court's majority never reached the question of apportionment between IBP and the Second Injury Fund as did the dissenting judge.

IBP asserts that Norris has sustained sufficient permanent disability to warrant payment of weekly benefits from the Second Injury Fund. IBP contends, therefore, liability for Norris' weekly benefits should have been apportioned between IBP and the Second Injury Fund. To support its argument, IBP relies on Dr. Dougherty's extrapolated percentages for the overall disability or combined value of Norris' disabilities of the body as a whole—36 percent to the body as a whole, that is, 12 percent attributable to injuries of Norris' arm, legs, and shoulders, and 24 percent pertaining to Norris' loss of sight. IBP suggests that, on the basis of Dr. Dougherty's evaluations of anatomical loss and because Norris' loss of sight accounts for disability of 24 percent out of the 36 percent expressed by Dr. Dougherty, the Second Injury Fund is liable for 24/36, or 2/3, of Norris' weekly benefits. Thus, IBP would be liable for only one-third of such benefits. Payment from the Second Injury Fund is governed by Neb. Rev. Stat. § 48-128 (Reissue 1984), which provides in part:

If an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, which is or is likely to be a hindrance or obstacle to his obtaining employment or obtaining reemployment if the

employee should become unemployed and which was known to the employer prior to the occurrence of a subsequent compensable injury, receives a subsequent compensable injury resulting in additional permanent partial or in permanent total disability so that the degree or percentage of disability caused by the combined disabilities is *substantially greater* than that which would have resulted from the last injury, considered alone and of itself; and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability, and for the additional disability the employee shall be compensated out of a special trust fund created for that purpose, which sum so set aside shall be known as the Second Injury Fund.

(Emphasis supplied.)

For liability of the Second Injury Fund, statutory predecessors of the present § 48-128 required that the combined injuries must result in "total disability," see § 48-128 (Reissue 1968), whereas, by amendment, see § 48-128 (Reissue 1974), the present statute relates to claims based on additional permanent partial disability or permanent total disability.

Under the statutory scheme of § 48-128, the amount payable from the Second Injury Fund is, ordinarily, the difference between the weekly benefits payable for permanent disability from a second injury which is compensable and the weekly benefits payable for the combined permanent disabilities from a previous injury and such second injury. See 2 A. Larson, The Law of Workmen's Compensation § 59.34(a) (1986).

To recover from the Second Injury Fund, § 48-128, a claimant must prove by a preponderance of evidence (1) a prior permanent partial disability, (2) a second or subsequent injury which is compensable, causing permanent disability, and (3) the combination of permanent disabilities existing after such second or subsequent injury is substantially greater in degree or percentage than permanent disability from the second or subsequent injury, considered by itself and not in conjunction

with the prior permanent disability.

One claiming against the Second Injury Fund has the burden to prove that the combination of permanent disabilities is substantially greater in degree or percentage than the permanent disability from the second or subsequent compensable injury considered by itself. *Flansburg v. Giza*, 284 Minn. 199, 169 N.W.2d 744 (1969). See, also, *Benson v. Barnes & Barnes Trucking*, 217 Neb. 865, 354 N.W.2d 127 (1984) (on employer's claim for apportionment of benefits and payment by the Second Injury Fund, burden of proof is on employer).

Whether a combination of permanent disabilities, within the purview of § 48-128, is substantially greater than permanent disability from a second or subsequent compensable injury is a question of fact. See *Matter of Garcia v Brassiere Rest.*, 66 A.D.2d 930, 411 N.Y.S.2d 448 (1978).

Findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case. Neb. Rev. Stat. § 48-185 (Reissue 1984); *Zaleski v. Farmland Foods*, 219 Neb. 157, 361 N.W.2d 523 (1985). In testing the sufficiency of evidence to support findings of fact made by the Nebraska Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. *Vredeveld v. Gelco Express*, 222 Neb. 363, 383 N.W.2d 780 (1986); *Knudsen v. Metropolitan Utilities Dist.*, 220 Neb. 902, 374 N.W.2d 56 (1985). Factual determinations by the Workers' Compensation Court will not be set aside on appeal unless such determinations are clearly wrong. Regarding facts determined and findings made after rehearing in the Workers' Compensation Court, § 48-185 precludes the Supreme Court's substitution of its view of facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court. *Vredeveld v. Gelco Express, supra; Gibson v. City of Lincoln*, 221 Neb. 304, 376 N.W.2d 785 (1985). As the "trier of fact," the Nebraska Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given testimony. Entering into a resolution by the Workers' Compensation Court regarding any

conflict of evidence are factors such as the respective interests of the parties in the lawsuit; demeanor of witnesses, including the parties, while testifying before the court; the apparent fairness exhibited by the witnesses; the extent to which the testimony of the various witnesses was corroborated; and the reasonableness or unreasonableness of statements of such witnesses. *Thompson v. Monfort of Colorado*, 221 Neb. 83, 375 N.W.2d 601 (1985).

Weekly benefits for total disability are determined in accordance with Neb. Rev. Stat. § 48-121(1) (Reissue 1984) of the Nebraska Workers' Compensation Act. For partial disability, weekly benefits are determined by § 48-121(2), except in cases of a specific "schedule injury" classified in § 48-121(3).

An analysis of the bases for payment of weekly benefits is contained in *Jeffers v. Pappas Trucking, Inc.*, 198 Neb. 379, 253 N.W.2d 30 (1977):

Section 48-121 . . . provides for compensation for three categories of job-related disabilities. Subdivision (1) sets the amount of compensation for total disability; subdivision (2) sets the amount of compensation for disability partial in character, except in cases covered by subdivision (3); and subdivision (3) sets out "schedule" injuries to specified parts of the body with compensation established therefore. Disability under subdivisions (1) and (2) refers to loss of employability and earning capacity, and not to functional or medical loss alone. [Citations omitted.] Thus losses in bodily function, so far as subdivisions (1) and (2) are concerned, are important only insofar as they relate to earning capacity and employability. [Citation omitted.]

For claims falling under subdivision (3), however, it is immaterial whether an industrial disability is present or not. [Citation omitted.] . . . There is, however, an exception to this rule. Where "an employee has suffered a schedule injury to some particular member or members, and some unusual or extraordinary condition as to other members or any other part of the body has developed," he may be compensated under subdivision (1) or (2) of

section 48-121. [Citations omitted.]

. . . [I]f an employee suffers a schedule injury which falls under subdivision (3), of section 48-121 . . . he is entitled only to the compensation provided for in that subdivision, unless some unusual or extraordinary condition as to other members or other parts of the body has developed. The presence or absence of industrial disability is immaterial in cases falling under subdivision (3). If the injury falls under either subdivision (1) or (2), however, a determination must be made as to the employee's loss of employability or earning capacity, and loss of bodily function is not at issue.

*Id.* at 384-85, 253 N.W.2d at 33-34.

"Earning power," as used in Neb. Rev. Stat. § 48-121(2) . . . is not synonymous with wages, but includes eligibility to procure employment generally, ability to hold a job obtained, and capacity to perform the tasks of the work, as well as the ability of the workman to earn wages in the employment in which he is engaged or for which he is fitted.

*Akins v. Happy Hour, Inc.*, 209 Neb. 236, 239, 306 N.W.2d 914, 916 (1981).

*Franzen v. Blakley*, 155 Neb. 621, 52 N.W.2d 833 (1952), involved an employee's claim against the Second Injury Fund. Franzen's first accident, nonindustrial in origin, caused permanent partial disability to Franzen's right wrist. A subsequent and compensable injury caused permanent partial disability of Franzen's left hand. After the second accident, Franzen was "not able to do the work of her former employment, or any other kind of work that required the effective use of her hands." *Id.* at 624, 52 N.W.2d at 836. A physician testified that Franzen was unemployable as the result of the condition of her hands. In *Franzen*, this court stated at 628, 52 N.W.2d at 838:

[P]laintiff's disability to her right hand is not, as such, a compensable injury under section 48-121 . . . . It is a fact condition which becomes material in applying the provisions of section 48-128 . . . . [T]he Legislature in section 48-128 . . . was not undertaking to provide

compensation for a previous disability other than one caused by disease, as such, but rather was undertaking to provide compensation for permanent total disability resulting from a combination of the previous fact condition with a compensable injury.

Subsequently, in *Camp v. Blount Bros. Corp.*, 195 Neb. 459, 238 N.W.2d 634 (1976), this court considered a claim by a carpenter (Camp) against the Second Injury Fund, based on a compensable prior disability of 25 percent permanent partial disability to Camp's right foot and a subsequent compensable injury causing permanent partial disability to Camp's left foot, as well as 5 percent permanent partial disability "to the body as a whole." This court noted in *Camp* at 463, 238 N.W.2d at 637: "The medical testimony is that the disability to the plaintiff's feet prevents him from doing rough carpenter work, and the only work he could do would be sitting down at a bench, not moving around or lifting anything." The State contended that the Second Injury Fund was not liable because Camp's injuries were "schedule injuries" compensated under § 48-121(3). Citing *Franzen v. Blakley, supra*, this court acknowledged that "the purpose of section 48-128 . . . is not to provide compensation for the previous disability but to provide compensation for permanent total disability resulting from a combination of the previous fact condition with a compensable injury." 195 Neb. at 464, 238 N.W.2d at 638. In *Camp*, the court concluded: "Section 48-128 . . . makes no distinction between a compensable first injury or a noncompensable injury. It is the previous fact condition combined with a second compensable injury causing permanent total disability in fact that establishes the right of the employee to compensation from the Second Injury Fund." 195 Neb. at 465, 238 N.W.2d at 638.

In *Akins v. Happy Hour, Inc., supra*, the employee's left arm had been amputated in an automobile accident, in 1952, which was not work-related. Akins severely cut the thumb of his right hand in 1978 during an industrial accident and sustained a "45 to 55 percent disability of the thumb, which translates to a 10 to 12 percent disability of the body as a whole. The total physical disability suffered from the combined injuries is a 62 percent permanent disability of the body as a whole." 209 Neb. at 237,

306 N.W.2d at 915. After noting Akins' unsuccessful attempt to obtain similar employment after his employer's cessation of business, we stated in *Akins*: "[P]laintiff's employability with his combined disabilities is substantially less than it would have been if he had only the injury to his thumb." 209 Neb. at 240, 306 N.W.2d at 917. Consequently, in *Akins* this court determined that the employer was liable for 12 percent disability of the body as a whole and the Second Injury Fund was liable for the remaining permanent partial disability of the body as a whole.

From the foregoing cases, a rule has evolved concerning a claim against the Second Injury Fund, § 48-128: With the exception of increased disability resulting from additional injury to the same specific member of the body, as classified by § 48-121(3), *disability* for the purpose of § 48-128 means the decrease or loss of earning power (capacity) or diminished employability. Frequently, "disability" is expressed in terms of a percentage of disability to the body as a whole, that is, anatomical loss of function. As a practical matter, in the absence of other evidence, such percentage of disability of "the body as a whole" may be accepted as the index for determination of weekly benefits under § 48-121(2). See *Jeffers v. Pappas Trucking, Inc.*, 198 Neb. 379, 253 N.W.2d 30 (1977).

However, in addition to establishing an employee's decrease or loss of earning power or diminished employability, a claimant seeking payment from the Second Injury Fund must also establish that, after the second or subsequent compensable injury, an employee's combined permanent disabilities are *substantially greater* than the permanent disability from the last compensable injury considered by itself.

Under § 48-128, a combination of permanent disabilities is "substantially greater" than permanent disability from the second or subsequent injury when the resulting permanent disability from all causes combined is substantially greater than the disability resulting solely from the second or subsequent compensable injury. See *Rex E. Lantham Co. v. Indus. Com'n of Utah*, 717 P.2d 255 (Utah 1986).

For the combination of permanent disabilities necessary to sustain a claim against the Second Injury Fund, the prior

permanent partial disability or disabilities must interact with the effects of the second or subsequent compensable injury and enhance the permanent disability that otherwise results from the later compensable injury alone. See *Bordo Citrus Products v. Varnadore*, 395 So. 2d 260 (Fla. App. 1981). See, also, *Davis v. Conger Life Insurance Company*, 201 So. 2d 727 (Fla. 1967), where the Florida Supreme Court, construing a former statute substantially similar to Nebraska's § 48-128, held that the combined disabilities must have the "total effect of creating a greater degree of disability to the body as a whole and a claimant's wage-earning capacity than would have resulted from the last injury considered by itself and not in conjunction with a previous injury." 201 So. 2d at 729.

As expressed in 2 A. Larson, The Law of Workmen's Compensation § 59.32(g) at 10-447 (1986):

> Although the prior impairment need not combine with the compensable injury in any special way, it must add something to the disability before the Special Fund [Second Injury Fund] can become liable. In other words, it is not enough to show that the claimant had some kind of handicap, if that handicap contributed nothing to the final disability.

Norris has unquestionably experienced problems in locomotion, lifting, reaching, and standing for protracted periods. We recognize, and do not minimize or disregard, those limitations consequent to Norris' injuries involving his knees, arm, and shoulders. The question is not whether those injuries are serious. The gravity of those individual injuries is obvious and beyond question. Rather, the issue is whether Norris' disability from loss of sight, when combined with the permanent disability from injuries to his knees, arm, and shoulders, resulted in permanent disability *substantially greater* in degree or percentage than would have resulted from Norris' injuries at IBP, considered by themselves and apart from Norris' loss of sight.

Dr. Dougherty rendered his opinion about Norris' permanent disabilities and expressed his evaluation in terms of percentages of disability sustained in specific areas of Norris' body, as well as an overall disability or combined value for

disability resulting from all injuries. On the basis of Dr. Dougherty's extrapolations, the loss of sight in Norris' eye accounted for 24 percent out of the 36 percent resulting from the overall disability or combined value of all permanent disabilities sustained by Norris. One might reasonably conclude that 36 percent (combination value of all disabilities) is substantially greater than 12 percent (disability from injuries at IBP) and that 24 percent (loss of sight) is a substantial contribution to Norris' overall disability or combined value of disabilities. As a simple arithmetical expression, when the various and individual percentages assigned to loss of function ("body as a whole") are added together, the sum of permanent partial disabilities for Norris' body as a whole is 42 percent—24 percent attributable to Norris' loss of sight, 18 percent to the injuries at IBP. From a purely mathematical analysis, one might conclude that 42 percent (combined disabilities) is substantially greater than 18 percent (disability from injuries at IBP).

In Dr. Dougherty's testimony there is an internal inconsistency or self-contradiction regarding Norris' industrial disability in relation to the loss of sight in Norris' right eye. Dr. Dougherty's evaluation of Norris' disability, after injuries at IBP, went further than an evaluation expressed in terms of overall disability, combined value of disabilities, and the anatomical loss in Norris' bodily function. Given Norris' work history, Dr. Dougherty expressed his opinion that Norris' loss of sight contributed nothing to Norris' present disability. If that testimony from Dr. Dougherty is accepted, Norris' disability, after the injuries at IBP, was unaffected by the prior disability on account of loss of sight in Norris' right eye. Cf. *Franzen v. Blakley*, 155 Neb. 621, 52 N.W.2d 833 (1952) (medical testimony that the employee was "unemployable" as the result of the combined disabilities). Cf., also, *Camp v. Blount Bros. Corp.*, 195 Neb. 459, 238 N.W.2d 634 (1976) (medical testimony that combined disabilities prevented employee's work as a carpenter). From Dr. Dougherty's testimony, the majority of the Workers' Compensation Court may have concluded that the loss of sight had no effect on any industrial disability sustained by Norris or that the contributory effect of the loss of eyesight, as a factor of Norris' employability or

earning power, was insubstantial, when the disability on account of injuries at IBP is considered apart from Norris' combined disabilities, nonindustrial and industrial.

Resolution of such contradictory opinions from Dr. Dougherty was a question for the compensation court as the "trier of fact."

> A conflict or contradiction regarding an expert's opinion need not result from opinions expressed by different experts. A conflict or contradiction of opinions may arise in the course of testimony given by the same expert witness. A good faith conflict due to self-contradiction of an expert's opinions presents a question to be resolved by the trier of fact.

*Zaleski v. Farmland Foods*, 219 Neb. 157, 161, 361 N.W.2d 523, 526 (1985).

The rehabilitation counselor, Stricklett, testified that Norris' "job options as well as his earnings potential have been affected by his numerous injuries at Iowa Beef Processors," and also testified that the combination of injuries and resultant disability "would affect [employability] to *some* extent." (Emphasis supplied.) The compensation court may have concluded that the rehabilitation counselor's nebulous and equivocal statements about Norris' particular employability fail to supply a sound basis for comparison of Norris' disabilities; that is, a failure to establish that Norris' loss of earning power or employability, as the result of combined disabilities, is "substantially greater" than would have resulted from injuries sustained at IBP when such injuries at IBP are considered by themselves and apart from Norris' loss of sight. The Iowa rehabilitation evaluators indicated their inability to "identify problems specifically resulting" from the loss of sight in Norris' right eye as a hindrance to future employment.

Under the standard of review imposed on this court, we are unable to conclude that the findings of the Nebraska Workers' Compensation Court are clearly incorrect.

In his cross-appeal Norris maintains the Nebraska Workers' Compensation Court is incorrect in its determination of his loss of earning capacity, and contends his injuries entitle him to recover from the Second Injury Fund. Also, Norris asserts that

the Nebraska Workers' Compensation Court has a conflict of interest in this case, because § 48-128 charges that court with "the conservation of the assets of the Second Injury Fund," while the Nebraska Workers' Compensation Court is also the tribunal adjudicating questions involving disabilities which may bear upon recovery from the Second Injury Fund.

Our disposition of IBP's appeal also disposes of Norris' cross-appeal regarding payment from the Second Injury Fund.

Next, concerning Norris' contention that the findings of the Nebraska Workers' Compensation Court are incorrect in its determination of the weekly disability benefits payable to Norris, we are unable to state that the findings of the compensation court are clearly incorrect. The award of compensation is supported by the record. Denial of compensation regarding an alleged injury to Norris' back is a permissible finding in view of Dr. Dougherty's testimony that Norris had no significant disability to his back. We cannot conclude that the Nebraska Workers' Compensation Court was clearly incorrect in its findings determinative of weekly benefits payable to Norris.

Norris' assertion that the Nebraska Workers' Compensation Court has a conflict of interest regarding the Second Injury Fund is an interesting question—whether the Nebraska Workers' Compensation Court, as custodian of the Second Injury Fund and charged with conservation and preservation of that fund, is the proper tribunal for adjudication of claims against the Second Injury Fund. However, that question was never raised in the Nebraska Workers' Compensation Court. In an appeal after rehearing in the Nebraska Workers' Compensation Court, the Supreme Court will consider only those issues or questions properly presented and disposed in the Nebraska Workers' Compensation Court. See, *State v. Fletcher*, 221 Neb. 562, 378 N.W.2d 859 (1985); *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985). "In the absence of plain error, where an issue is raised for the first time in the Supreme Court, such issue will be disregarded inasmuch as the court whose judgment is being reviewed cannot commit error regarding an issue never presented and submitted for disposition." *Holden v. Urban, ante* p. 472, 474, 398 N.W.2d

699, 701 (1987). Consequently, we do not address any question concerning a conflict of interest asserted by Norris.

Finally, because IBP's appeal raised a question concerning apportionment between the Second Injury Fund and IBP regarding the payment of weekly benefits, and did not involve the amount of compensation payable to Norris, an attorney fee cannot be awarded to Norris under Neb. Rev. Stat. § 48-125 (Reissue 1984). On his cross-appeal, Norris has failed to obtain an increase in the amount of compensation awarded. Therefore, Norris is not entitled to an attorney fee on his cross-appeal. See § 48-125.

Inasmuch as we are unable to conclude that any finding by the Nebraska Workers' Compensation Court is clearly incorrect, the judgment and award entered by the Nebraska Workers' Compensation Court are affirmed.

AFFIRMED.