412 N.W.2d 469 (1987)
226 Neb. 526
Jack PARKER, Appellee and Cross-Appellee,
v.
SAINT ELIZABETH COMMUNITY HEALTH CENTER, Appellee and Cross-Appellant, State of Nebraska, Second Injury Fund, Appellant and Cross-Appellee.
No. 86-814.
Supreme Court of Nebraska.
September 18, 1987.
*471 Robert M. Spire, Atty. Gen., Martel J. Bundy, and Janie C. Castaneda, Lincoln, for appellant.
Scott A. Burcham of Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, for appellee Parker.
Anne E. Winner of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., Lincoln, for appellee Saint Elizabeth Community Health Center.
BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.
HASTINGS, Justice.
This is an appeal from the Workers' Compensation Court by the State of Nebraska, Second Injury Fund (Fund). The principal legal question involved is whether, in cases of enhanced disability due to an earlier injury or disability, the Fund is obligated to pay benefits for other than permanent disability and an attorney fee where applicable. A subsidiary factual issue raised by Saint Elizabeth Community Health Center (Health Center) on cross-appeal is whether responsibility for the present degree of Jack Parker's permanent partial disability should be apportioned between the Fund and the Health Center. We affirm.
Parker had polio as a child. As a result, Parker wore a brace on his right leg, and, in order to walk, he had to put his weight on his left leg and swing his right leg forward. On his Health Center employment application Parker indicated that he had had polio, wore a brace, and had back injury or low back pain. Parker testified *472 that the way he had to walk caused slight discomfort in his back.
According to the stipulation of the parties, on July 15, 1982, Parker experienced a compensable injury by falling off a ladder while employed as an x-ray technician by the Health Center. He felt immediate pain in his left knee and in his back. Parker was hospitalized overnight and did not return to work until August 29, 1982. He continued to have trouble with his left knee and had increased back pain. Parker testified that because of the injury he favored his left knee, which changed his gait and put more strain on his back.
Parker was admitted to the hospital for arthroscopic surgery on September 29, 1983, and returned to work on November 1. He was terminated from the Health Center in September of 1985 for producing poor quality x-ray films. He had been put on probation for poor quality work in 1982 before the accident occurred. Parker testified that after the accident he tended not to retake poor quality films because walking was painful and he did not want to push the x-ray machine back to the patient's location.
After being terminated from the Health Center, Parker sold home water treatment systems. His pain became worse, and he resigned at the end of April 1986 and has not worked since that time.
On rehearing, the three-judge panel found that as a result of the injury, Parker incurred medical and hospital expenses and was temporarily totally disabled from July 15 through August 28, 1982, from September 29 through October 31, 1983, and from May 1 through July 24, 1986, which was the date of the rehearing, and that he would remain temporarily totally disabled for an indefinite period of time. The Workers' Compensation Court also found that Parker had suffered a 15-percent permanent partial impairment of his left leg as a result of the accident and injury.
The court further found that at the time of Parker's accident and injury he had a preexisting permanent partial impairment resulting from polio. The court found that the disability that Parker suffered to his body as a whole as a result of the accident and injury, combined with the preexisting impairment, resulted in a disability substantially greater than that which would have resulted from the last injury considered alone. The court found that the Health Center had knowledge of Parker's preexisting impairment and thus found that the Fund should be liable for a portion of the benefits awarded to Parker.
The court found that Parker was entitled to benefits of $180 per week for 23 2/7 weeks of temporary total disability compensation to the date of the rehearing and was entitled to benefits of $180 per week for so long in the future as he should remain totally disabled. The court also found that Parker was entitled to benefits of $180 per week for 32¼ weeks for the 15-percent permanent partial disability to his left leg. The court additionally found that when Parker's total disability should cease, he shall be entitled to compensation for any residual permanent partial disability to his body as a whole due to the accident and injury. The court further found that the injury that Parker suffered would of itself have caused only a 5-percent permanent partial disability to the body as a whole, and thus the Fund was liable for the additional disability.
The court therefore ordered that Parker recover from the Health Center the sum of $180 per week for a period of 11 1/7 weeks for temporary total disability compensation through October 31, 1983, and thereafter and in addition thereto the sum of $180 per week for 32¼ weeks for the 15-percent permanent partial disability to his left leg, and thereafter and in addition thereto the sum of $9.20 per week for 288 6/7 weeks for the 5-percent permanent partial disability to his body as a whole, less a credit for temporary total disability already paid. The court also ordered the Health Center to pay Parker's medical expenses already incurred and any future medical and hospital expenses reasonably necessary as a result of the accident and injury. The Health Center was also ordered to pay attorney fees of $1,000.
*473 The court ordered that Parker recover from the Fund the sum of $170.80 per week for temporary total disability from and after May 1, 1986, up to the date of the rehearing and thereafter so long in the future as Parker shall remain totally disabled. If Parker remains totally disabled for longer than 300 weeks, the Fund was ordered to pay $180 per week for so long as he shall remain totally disabled. If Parker's total disability ceases before the expiration of 300 weeks, the Fund was ordered to pay compensation for that permanent partial disability that Parker thereafter suffers in excess of 5 percent.
The court also found that as a result of the accident and injury Parker was unable to perform work for which he has previous training or experience and was entitled to vocational rehabilitation services and approved his participating in an 18-month program at Southeast Community College resulting in an associate degree in business.
The Fund appeals from the award on rehearing, alleging that the Workers' Compensation Court erred in providing that the Fund be responsible for paying $170.80 per week for so long as Parker should remain temporarily totally disabled, including the period that he is undergoing vocational rehabilitation. The Fund also alleges that the court erred in providing that the 32¼ weeks of compensation awarded to Parker for the 15-percent permanent partial disability to his left leg should not reduce the 300-week period of compensation to which he is entitled for the disability to his body as a whole.
On cross-appeal, the Health Center alleges that the court erred in assessing responsibility to the Health Center for the entire 15-percent permanent partial disability to Parker's left leg.
Neb.Rev.Stat. § 48-128 (Reissue 1984) provides in pertinent part:
If an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, which is or is likely to be a hindrance or obstacle to his obtaining employment or obtaining reemployment if the employee should become unemployed and which was known to the employer prior to the occurrence of a subsequent compensable injury, receives a subsequent compensable injury resulting in additional permanent partial or in permanent total disability so that the degree or percentage of disability caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself; and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability, and for the additional disability the employee shall be compensated out of a special trust fund created for that purpose, which sum so set aside shall be known as the Second Injury Fund.
The Fund argues that because the statute mentions only permanent partial or permanent total disability, the Fund should be liable only for permanent benefits and not for temporary benefits, including those paid while a plaintiff is undergoing vocational rehabilitation. However, the purpose of the Fund is as follows:
If an employer, knowing that an employee has a preexisting condition, agrees nevertheless to employ the individual and the employee subsequently suffers a second injury which, but for the preexisting condition, would have produced a lesser degree of injury and disability and, therefore, a smaller payment by the employer, then the employer is only required to pay for that portion of the total injury which would have occurred without the preexisting condition. The balance is to be paid out of the Second Injury Fund.
Benson v. Barnes & Barnes Trucking, 217 Neb. 865, 874-75, 354 N.W.2d 127, 133 (1984). Such funds were created so that employers would be encouraged to hire the handicapped and would be secure in the knowledge that if there is a work-related accident, the employer and its insurance *474 carrier would be liable only for those injuries that would have resulted had there been no preexisting disability. See 2 A. Larson, The Law of Workmen's Compensation § 59.31(a) (1987).
In the present case, but for the preexisting condition of polio, the torn medial meniscus that Parker suffered as a result of the accident would not have resulted in total disability. Dr. Garvin testified by deposition that, but for the polio, Parker probably would have been able to return to his job as an x-ray technician after undergoing his surgery for a torn meniscus. He further testified that Parker was no longer able to push the x-ray machine around, that Parker had difficulty climbing ladders and with prolonged walking or standing, and that those problems would be permanent in nature. Dr. Garvin concluded by stating that in his opinion Parker would only be able to do work where he could sit most of the time and not work under pressure and that he would have difficulty engaging in any employment that would require him to be on his feet or to ambulate for any significant period of time.
In his written report found in the record Dr. Garvin stated:
Because it has been my observation that the job of an x-ray technician requires a rather significant amount of walking, some elements of lifting, and general requirements for mobility, including pushing machines about the hospital to obtain x-rays, I feel that it is unlikely that Mr. Parker can return to that type of activity. In terms of future employment, I would feel that an occupation that would allow Mr. Parker to sit and not be required to constantly move above [sic], would be of benefit for him. He does have rather severe limitations in his ability to walk long distances, to climb ladders, to lift heavy objects over 20 or 30 lbs., not only because of his pre-existing polio condition, but also because of the more recent injuries to his low back as well as his left knee as a result of the fall from the ladder in July of 1982.
Tom Steel, a counselor with Nebraska Division of Rehabilitation Services of the State Department of Education, evaluated Parker and testified by deposition that based on his examination of the medical reports and his own observations as to the pain Parker seemed to be suffering from during his evaluation, Parker would have to have a strictly sedentary type of employment and could not return to that work for which he had already been trained. It was Steel's opinion that Parker would have to be retrained so as to qualify as an accountant or bookkeeper and that Parker was capable of completing such training.
Parker himself testified that his condition had been getting progressively worse, that he cannot even mow his lawn, that he has difficulty walking up stairs, and that he cannot work as an x-ray technician. He tried selling water treatment systems, but had to quit that because of the pain in his back. He also stated that he could no longer do real estate sales work or retail sales work, both of which he had done before. He had applied for jobs at convenience stores, even though that would require some standing, but had been unsuccessful. He knew of no sedentary-type job for which he had the necessary education, experience, or training. There was no type of work that he felt he could do physically without vocational training.
By whatever name it called Parker's condition, the compensation court correctly found as a matter of fact that Parker was, and until rehabilitated would continue to be, totally disabled. The findings of fact of the compensation court have the same force and effect as a jury verdict in a civil case and will not be set aside where they are supported by credible evidence and are not clearly wrong. Hewson v. Stevenson, 225 Neb. 254, 404 N.W.2d 35 (1987). Furthermore, a proper judgment will not be reversed because the trial court gave an erroneous reason for its rendition. Caradori v. Hamilton, 193 Neb. 500, 227 N.W.2d 850 (1975).
Parker's physician testified that Parker could no longer do the things necessary to be an x-ray technician and could do no job that would require him to stand, walk, or lift in a significant manner. He *475 said that condition was permanent. Tom Steel concluded that Parker could not return to work for which he had been trained and, in effect, until retrained was unable to obtain a meaningful sedentary job. Parker's own testimony supported that conclusion.
Permanent total disability can only be held to exist where the workman is unable to get, hold, or do any substantial amount of remunerative work, either in his previous occupation or in any other established field of employment for which he is fitted. [Citation omitted.]
Whether or not the plaintiff is totally and permanently disabled, and is entitled to receive the maximum allowable benefits, is a question of fact.
Boults v. Church, 200 Neb. 319, 320-21, 263 N.W.2d 478, 479-80 (1978).
A similar situation was addressed in Pollard v. Wright's Tree Service, Inc., 212 Neb. 187, 322 N.W.2d 397 (1982). The plaintiff had undergone several back operations unrelated to his employment with the defendant, and the employer knew of these prior problems. During the course and scope of employment, the plaintiff slipped and fell, injuring his neck. The employer paid the appropriate weekly rate during the plaintiff's recuperation period of about 2 years. The remainder of the plaintiff's 300-week maximum benefits for partial disability was assessed to the employer at 7½ percent permanent partial disability, with the Fund responsible for the balance. The Fund was also ordered to pay the plaintiff's benefits in full after the expiration of the 300-week period and "for the duration of plaintiff's total disability." Id. at 190, 322 N.W.2d at 401. The court also found that the plaintiff was entitled to vocational rehabilitation services.
The Fund in Pollard contended that because the compensation court did not specifically find that the plaintiff's total disability was permanent, the Fund was not liable until such a finding was made. This court stated:
Essentially, the fund argues that the requirement of vocational rehabilitation indicates that total disability at the present time might be reduced to some lesser percentage of partial permanent disability in the future as the result of such training, and that therefore present total disability is not a fixed, stable, or nonrecoverable disability and consequently is not permanent. It argues that unless there is a finding that total disability is permanent, it must be regarded as temporary and the fund cannot be held liable until that specific finding of fixed and permanent disability is made. We disagree.
Id. at 192-93, 322 N.W.2d at 402.
This court found in Pollard that the Fund was liable for the plaintiff's disability in excess of the 7½ percent that he would have incurred without the prior disability. Because the plaintiff could not return to the kind of work for which he had training and experience, he was at the present time totally and permanently disabled, although that disability might be reduced when vocational rehabilitation was complete. The court reasoned as follows: "The plaintiff should not be denied compensation for what is currently total permanent disability simply because his employability and earning capacity might become enhanced by rehabilitation and his permanent disability possibly reduced at some time in the future." Id. at 194, 322 N.W.2d at 402.
In the present case Parker should not be denied compensation simply because the Workers' Compensation Court used the term "temporary" instead of "permanent," nor should the Health Center be required to pay this compensation. Parker would not be totally disabled, nor would he need vocational rehabilitation, but for the polio. Thus, to carry out the purposes of the Fund, the court correctly ordered that the Fund pay temporary total disability benefits to Parker.
Parker started his vocational rehabilitation program on July 10, 1986, and the Fund believes it should not be liable for any payments during this program. We do not agree. Payments during vocational rehabilitation are covered in Neb.Rev.Stat. § 48-121(5) (Reissue 1984), which states: "The employee shall be entitled to compensation *476 from his or her employer for temporary disability while undergoing rehabilitation." Again, we do not agree that the term "temporary" relieves the Fund from liability. Parker would not need vocational rehabilitation but for the polio. Thus, the Fund was properly assessed payments during this time.
Section 48-121(5) provides that the employer should pay benefits while an employee undergoes rehabilitation. In Pollard v. Wright's Tree Service, Inc., supra, the Fund was determined to be an employer for the purposes of awarding attorney fees pursuant to Neb.Rev.Stat. § 48-125 (Reissue 1978). The logical extension of this determination is that the Fund may also be considered a statutory employer for the purposes of payment of disability during rehabilitation. Thus, the Fund's first assignment of error is without merit.
The Fund's second assignment of error involves § 48-121. This section was discussed in Norris v. Iowa Beef Processors, 224 Neb. 867, 877, 402 N.W.2d 658, 666-67 (1987):
"Section 48-121 ... provides for compensation for three categories of job-related disabilities. Subdivision (1) sets the amount of compensation for total disability; subdivision (2) sets the amount of compensation for disability partial in character, except in cases covered by subdivision (3); and subdivision (3) sets out "schedule" injuries to specified parts of the body with compensation established therefore. Disability under subdivisions (1) and (2) refers to loss of employability and earning capacity, and not to functional and medical loss alone. [Citations omitted.] Thus losses in bodily function, so far as subdivisions (1) and (2) are concerned, are important only insofar as they relate to earning capacity and employability. [Citations omitted.]..."
Quoting Jeffers v. Pappas Trucking, Inc., 198 Neb. 379, 253 N.W.2d 30 (1977).
Section 48-121(2) provides for a 300-week limitation on payments for partial disability and states that should total disability be followed by partial disability, the period of 300 weeks shall be reduced by the number of weeks during which compensation was paid for such total disability. The compensation court in the present case noted that § 48-121 does not provide that the 300-week period should additionally be reduced by the number of weeks during which compensation is paid for a disability under subsection (3). The court also noted that subsections (1) and (2) compensate impairments of the body as a whole in terms of loss of employability and earning capacity, while subsection (3) compensates impairments of scheduled members on the basis of loss of physical function. See Norris v. Iowa Beef Processors, supra. Thus, it determined that the 32¼ weeks of compensation to which Parker is entitled by reason of the 15-percent permanent partial impairment to his left leg should not reduce the 300-week period of compensation to which he is entitled by reason of the disability that he suffered to his body as a whole.
We agree that § 48-121 does not require that the 300-week period of compensation be reduced by the number of weeks during which compensation is paid under subsection (3). Therefore, the Fund's second assignment of error is also meritless.
On cross-appeal, the Health Center contends that it should be held liable for only 10 percent of the 15-percent permanent partial disability to Parker's left knee, with the Fund responsible for the remaining 5 percent. The Health Center argues that because Parker did not have developed muscles due to the polio, he was unable to fully rehabilitate his leg.
As previously stated, in reviewing workers' compensation cases, this court does not reweigh the facts. In a review of a workers' compensation case, the findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly wrong. Hewson v. Stevenson, 225 Neb. 254, 404 N.W.2d 35 (1987).
The Health Center points out that Dr. Garvin testified by deposition that, generally speaking, a healthy individual with good *477 quadriceps and hamstrings can rehabilitate himself or herself to about a 10-percent loss of function after medial meniscus arthroscopic surgery. However, Dr. Garvin also testified that permanent partial disability after such surgery ranges from 5 percent to 20 percent. In addition, the following exchange took place:
Q. And you have, as I understand, assessed a 15 percent disability to the left leg as a result of the medial meniscus surgery?
A. Correct.
Q. All right. And Doctor, had Mr. Parker been able tonot have polio and have well developed quadriceps and hamstrings, would he have been able to rehabilitate himself in a greater fashion so that it would have reduced that disability rating that you hadyou have given to us?
. . . .
A. Well again, it's somewhat speculative because every case in this business is very individual. And it's possible that a normal, active individual could wind up with a lesser loss of function. Or it's possible he could wind up with more of a loss of function if the rehabilitation program didn't work for one reason or another, or if theif the individual didn't cooperate. So that I guess I, you know, I
Because there was evidence that even a healthy individual may rehabilitate himself or herself to a 15-percent permanent partial disability, the court was not clearly wrong in finding that Parker's entire 15-percent permanent partial disability should be assessed against the Health Center, and this assignment of error is without merit.
The judgment of the Workers' Compensation Court is affirmed. Parker is awarded $1,000 for services of his attorney in this court, to be assessed jointly against the Second Injury Fund and Saint Elizabeth Community Health Center.
AFFIRMED.