PAMELA RITCHIE SHERARD, APPELLEE, V. BETHPHAGE MISSION, INC., A CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF, APPELLEE, STATE OF NEBRASKA, SECOND INJURY FUND, THIRD-PARTY DEFENDANT, APPELLANT.
464 N.W.2d 343

Filed January 11, 1991.    No. 90-260.

Robert M. Spire, Attorney General, and Lynn A. Melson for appellant.

T.J. Hallinan, of Cobb, Hallinan & Ehrlich, P.C., for appellee Sherard.

Walter E. Zink II and Jill Gradwohl Schroeder, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee Bethphage.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

The State of Nebraska, Second Injury Fund (Fund), appeals from an award for Pamela Ritchie Sherard on rehearing by the Nebraska Workers' Compensation Court which apportioned between the Fund and Bethphage Mission, Inc. (Bethphage), Sherard's employer, liability for payment of compensation benefits on account of Sherard's disability. We affirm.

## STANDARD OF REVIEW

"Findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case. . . . In testing the sufficiency of evidence to support findings of fact made by the Nebraska Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. . . . Factual determinations by the Workers' Compensation Court will not be set aside on appeal unless such determinations are clearly erroneous. Regarding facts determined and findings made after rehearing in the Workers' Compensation Court, § 48-185 precludes the Supreme Court's substitution of its view of facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court. . . . As the trier of fact, the Nebraska Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given testimony."

*Heiliger v. Walters & Heiliger Electric, Inc., ante* p. 459, 460-61, 461 N.W.2d 565, 568 (1990) (quoting from *Fees v. Rivett Lumber Co.*, 228 Neb. 617, 423 N.W.2d 483 (1988)). See Neb. Rev. Stat. § 48-185 (Reissue 1988).

## CLAIM AGAINST THE SECOND INJURY FUND

The focal point in this appeal is the Fund. See Neb. Rev. Stat. § 48-128 (Reissue 1988), which, pertinent to this appeal, provides:

If an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, which is or is likely to be a hindrance or obstacle to his or her obtaining employment or obtaining reemployment if the employee should become unemployed and which was known to the employer prior to the occurrence of a subsequent compensable injury, receives a subsequent compensable injury resulting in additional permanent partial or in permanent total disability so that the degree or percentage of disability caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability. For the additional disability, the employee shall be compensated out of a special trust fund created for that purpose, which sum so set aside shall be known as the Second Injury Fund.

## BACKGROUND FOR SHERARD'S CLAIM

*Sherard's Medical History.*

In May 1976, Dr. Paul Goetowski diagnosed the condition of Sherard, then 15 years old, as "spondylolysis with possibly a spondylolisthesis, Grade I," and a "bilateral pedicle defect," a congenital defect in the back portion of a vertebra. Spondylolisthesis is the slippage or displacement of one vertebra on another. Dr. Goetowski cautioned Sherard against her participation in activities which "are apt to produce a progression or a slipping forward" of the fifth lumbar vertebra on the first sacral vertebra. In Dr. Goetowski's opinion, "if symptoms are severe enough . . . fusion is considered." In February 1980, Dr. Goetowski noted an increase in Sherard's spondylolisthesis of "L5 on S1" after she had fallen twice. Although he had prescribed back-brace support and flexion exercises for Sherard, when Sherard's lumbosacral instability increased and resulted in low back pain, Dr. Goetowski

performed a lumbosacral fusion, "L4-5 to S1," in March 1980.

In July 1982, Sherard again injured her back, when she was assaulted while working as a waitress. After this injury, Sherard experienced low back pain, as well as muscle spasms and leg cramps that would last "[d]ays at a time." Sherard's pain increased to a point where "to walk was very difficult," forcing her to take "very small steps" and requiring her "to use a cane sometimes to get around." Dr. Goetowski at that time described Sherard's low back pain as a chronic, recurrent, and permanent problem.

Dr. Goetowski performed a refusion of L4-5 to S1 in February 1983 and a right sacral iliac fusion in September 1983. In February 1984, Dr. Goetowski formed the opinion that Sherard had "approximately 50% permanent partial residual anatomically of her back now and for the foreseeable future."

*Sherard's Injuries at Bethphage.*

After Sherard's unsuccessful efforts to obtain employment in 1984, the Nebraska Job Service placed Sherard in an on-the-job training program with Bethphage Mission, an institution for mentally disabled adults, in Lincoln, Nebraska. Bethphage's file on Sherard contained documentation that Bethphage knew about Dr. Goetowski's treatment of Sherard's back condition, including the vertebral fusions. Sherard's job responsibilities at Bethphage were mainly physical assistance to patients in their daily activities, such as bathing, feeding, walking, and exercising. While working, Sherard slipped on Bethphage's dining room floor on August 9, 1985, fell, struck her back on a chair, and was off work until September 12, 1985.

Sherard was again injured at Bethphage on January 14, 1986, when she was attempting to restrain a patient who was striking other patients and staff members. The patient lunged and caused Sherard to fall into a wall. Before this injury, Sherard "had never experienced [pain] going clear to [her] foot and making [her] foot numb." After this accident, Sherard perceived "throbbing, aching, shooting, hot pain" through her lower back and right leg. In April 1986, Dr. Gene Lewallen, an orthopedic surgeon who treated Sherard after Dr. Goetowski's retirement, performed a refusion of "L4-5" on Sherard and, in

February 1987, estimated Sherard's permanent physical impairment at 50 percent of the body as a whole.

As a result of the 1986 accident, Sherard was unable to return to her employment at Bethphage. At the request of Bethphage's insurance carrier, Sherard met with James Kincaid, a rehabilitation specialist, in the summer of 1987. After Sherard consulted with Kincaid in 1987, she began a college course in a sign language program, but prolonged sitting in a classroom caused Sherard to develop sacral decubitus, commonly known as a pressure spot or bedsore. In light of Sherard's persistent decubitus, her physician, Dr. George Walcott, recommended that Sherard withdraw from the signing class because "[s]o far as application of vocational training, it would appear as though it's going to be difficult for her to sit for any length of time over an hour." In April 1988, Sherard moved to Arizona, where she lived until May 1989, when she returned to Nebraska. While in Arizona, she was treated by Dr. Andre Matthews, an orthopedist, who, on August 5, 1988, estimated Sherard's permanent impairment to be 61 percent of the body as a whole.

REHEARING IN WORKERS' COMPENSATION COURT
*Evidence.*

In her testimony at the rehearing in the Nebraska Workers' Compensation Court, Sherard described her vocational background before the injuries at Bethphage and her physical difficulties after the accident in 1986. Sherard was trained, and obtained state certification, as an emergency medical technician and has served on the staff of an intermediate care facility for mentally disabled persons. Most of Sherard's work history has involved "totally" physical work, such as manually lifting disabled people. However, after the 1986 accident, she experienced almost constant back pain, which was exacerbated by everyday physical exertion, and was unable to do any task which required bending, stooping, lifting, or standing for any protracted period. Several orthopedists testified concerning Sherard's physical limitations after the 1986 accident and expressed their opinions on her disability on account of the 1986 injury. Sherard was "markedly limited in her ability to move" and was unable to lift over 25 pounds. Sherard exhibited

"considerable limitation in the range of motion of her back," demonstrated limited flexion and extension in her "extremely stiff back," and was unable to return to "gainful employment." One orthopedist testified: "I don't think [Sherard is] capable of any kind of work. . . . [H]er back hurt. It bothered her when she'd walk, it bothered her when she'd sit. I doubt if she'd be very good employment for anyone."

Kincaid, the rehabilitation specialist, testified that, based on Sherard's medical history, which included Dr. Goetowski's 1984 evaluation that Sherard had permanent partial disability of 50 percent to the body as a whole, Sherard had an 80-percent "vocational disability" and permanent loss of earning capacity in 1984 due to the "very severe restrictions" imposed by Dr. Goetowski, such as Sherard's wearing a back brace during ordinary physical activities. These medical restrictions hindered Sherard's obtaining employment. During cross-examination of Kincaid, the following occurred:

> [Bethphage's lawyer:] And based upon the medical records that you reviewed and your interviews with Mrs. Sherard and your skill, training, education and experience, do you have an opinion as to whether her accident of January of 1986 resulted in additional permanent loss of earning capacity above that which existed on February 27th of 1984?
>
> [Kincaid:] Yes.
>
> [Fund's lawyer:] I'm going to object, no sufficient foundation . . . .

After the court overruled the Fund's objection, Kincaid answered: "I felt at that time that she had an additional 15 percent vocational disability as a result of . . . this injury of [January] '86."

Later during Kincaid's cross-examination, Bethphage's lawyer asked: "[D]o you have an opinion as to whether the combined losses of earning capacity present before January of 1986 and the additional loss of earning capacity resulting from the accident of January of 1986 is greater than what would have resulted from the accident of January 1986 considered alone?"

The Fund's lawyer interjected: "Again, I'll object, no sufficient foundation."

When the court overruled the preceding objection, Kincaid responded that Sherard's January 1986 accident at Bethphage resulted in an additional 15-percent permanent loss of earning capacity or "vocational disability" above Sherard's 80-percent permanent loss of earning capacity which existed in 1984, a combination of disabilities which rendered Sherard "unemployable."

Dr. Matthews, responding to the question whether "the combined effect of Mrs. Sherard's disability which preexisted August of 1985 and the disability which resulted from the accident of January of 1986 . . . was substantially greater than what resulted from the injury of January of 1986 considered alone and of itself and without the presence of the preexisting disabilities," answered, "[Y]es."

*Findings by Workers' Compensation Court.*

The Nebraska Workers' Compensation Court found that before Sherard's injuries at Bethphage, she "was suffering a preexisting disability greater than 25 percent" and that Bethphage had written notice of Sherard's preexisting condition, but retained her in its employ. The court's majority found that "the accident of January 13, 1986 standing alone and of itself would have produced a 15% permanent partial disability to [Sherard's] body as a whole." Based on Bethphage's liability for 15 percent of Sherard's permanent partial disability, the court's majority then allocated liability for payment of weekly compensation benefits to Sherard, including the Fund's liability for 85 percent of the benefits for Sherard's permanent partial disability and benefits for total disability "so long in the future" as Sherard remains totally disabled. The Nebraska Workers' Compensation Court made no reference to vocational rehabilitation for Sherard.

## ASSIGNMENTS OF ERROR

The Fund's several assigned errors may be summarized as four, namely, the Nebraska Workers' Compensation Court erred in (1) finding that Bethphage sustained its burden under § 48-128 to prove that Sherard's preexisting permanent partial disability, combined with her subsequent disability from the 1986 accident, resulted in a disability substantially greater than

that which would have resulted from the 1986 injury, "considered alone and of itself"; (2) overruling the Fund's foundation objections to Kincaid's testimony regarding Sherard's loss of earning capacity; (3) finding that Sherard is totally disabled; and (4) failing to order vocational rehabilitation for Sherard.

### RECOVERY AGAINST SECOND INJURY FUND

To recover from the Second Injury Fund, § 48-128, a claimant must prove by a preponderance of evidence (1) a prior permanent partial disability, (2) a second or subsequent injury which is compensable, causing permanent disability, and (3) the combination of permanent disabilities existing after such second or subsequent injury is substantially greater in degree or percentage than permanent disability from the second or subsequent injury, considered by itself and not in conjunction with the prior permanent disability.

*Norris v. Iowa Beef Processors*, 224 Neb. 867, 875-76, 402 N.W.2d 658, 665-66 (1987).

For the combination of permanent disabilities necessary to sustain a claim against the Second Injury Fund, the prior permanent partial disability or disabilities must interact with the effects of the second or subsequent compensable injury and enhance the permanent disability that otherwise results from the later compensable injury alone. . . .

As expressed in 2 A. Larson, The Law of Workmen's Compensation § 59.32(g) at 10-477 (1986): "Although the prior impairment need not combine with the compensable injury in any special way, it must add something to the disability before the Special Fund [Second Injury Fund] can become liable. In other words, it is not enough to show that the claimant had some kind of handicap, if that handicap contributed nothing to the final disability."

*Norris, supra* at 880-81, 402 N.W.2d 668-69.

Therefore, the main issue in the present appeal is whether, as a factual matter, Sherard's disability before her 1986 accident at Bethphage, when combined with her disability from the 1986

accident, resulted in disability substantially greater in degree or percentage than would have resulted from Sherard's 1986 Bethphage injury, considered alone.

"Disability," in the context of § 48-128, means an employee's diminution of employability or impairment of earning power or capacity. *Norris, supra.* Cf. *Heiliger v. Walters & Heiliger Electric, Inc., ante* p. 459, 461 N.W.2d 565 (1990) (employee's total or permanent partial disability as a basis for compensation under Neb. Rev. Stat. § 48-121 (Reissue 1988), except disability from "schedule" injuries described in § 48-121(3)).

"Whether a combination of permanent disabilities, within the purview of § 48-128, is substantially greater than permanent disability from a second or subsequent compensable injury is a question of fact." *Norris, supra* at 876, 402 N.W.2d at 666.

Kincaid, the rehabilitation specialist, estimated Sherard's permanent loss of earning capacity at 80 percent in February 1984, with an additional 15-percent loss of earning capacity after Sherard's 1986 accident. Simple arithmetic evidences a 95-percent loss of earning capacity, or, in all practicality, a total loss of earning capacity, from Sherard's combined disabilities, with 15 percent of the loss attributable to the 1986 accident, considered alone. With Kincaid's assessment of Sherard's loss of earning capacity, before and after Sherard's injury at Bethphage, the opinions from Kincaid and Dr. Matthews supplied a basis for the conclusion that Sherard's loss of earning capacity before 1986, combined with her additional loss of earning capacity from the January 1986 accident, was greater than the loss which would have resulted from the January 1986 accident, considered alone.

Under the standard of review for this court, we cannot conclude that the Nebraska Workers' Compensation Court, as the sole judge of witness credibility and weight to be given a witness' testimony, was clearly erroneous in its finding that the Fund is liable for Sherard's compensation benefits payable pursuant to § 48-128.

## KINCAID'S TESTIMONY

The Fund argues that Kincaid's opinions as an expert

regarding Sherard's loss of earning capacity, before and after Sherard's 1986 accident at Bethphage, were without foundation.

First, we note that the Nebraska Evidence Rules do not apply to "proceedings before the Nebraska Workers' Compensation Court . . . ." Neb. Evid. R. 1101(4)(d), Neb. Rev. Stat. § 27-1101(4)(d) (Reissue 1989); *Harpham v. General Cas. Co.*, 232 Neb. 568, 441 N.W.2d 600 (1989). See, also, Neb. Rev. Stat. § 48-168 (Reissue 1988) (Nebraska Workers' Compensation Court is not bound by "common-law or statutory rules of evidence"). Cf., *Fite v. Ammco Tools, Inc.*, 199 Neb. 353, 258 N.W.2d 922 (1977) (Nebraska Workers' Compensation Court cannot utilize evidential standards more restrictive than the Nebraska Evidence Rules); *Friedeman v. State*, 215 Neb. 413, 339 N.W.2d 67 (1983) (Nebraska Workers' Compensation Court may receive evidence inadmissible under the Nebraska Evidence Rules).

Although the Nebraska Evidence Rules are inapplicable to proceedings in the Nebraska Workers' Compensation Court, due process requirements may control the type of evidence in a trial of a workers' compensation case. *Harpham v. General Cas. Co., supra.* See, also, 3 A. Larson, The Law of Workmen's Compensation § 79.80 (1989) (evidence rules based on "fair play" in trials).

The Fund does not contend that reception of Kincaid's opinions contravenes the constitutional safeguard of due process, but contends that its foundation objections were "erroneously overruled by the rehearing panel." Brief for appellant at 13. Since the Nebraska Evidence Rules were inapplicable to the rehearing in Sherard's case, we need not evaluate the Fund's objections in relation to the Nebraska Evidence Rules. Kincaid's testimony was properly before the Nebraska Workers' Compensation Court for its consideration and use in disposing of the issues in Sherard's case.

However, even if the Nebraska Evidence Rules were applicable, the Fund's objections were invalid. First, the Fund's objections were interposed to questions which merely sought to establish that the expert had an opinion about a particular subject. An expert's possession of an opinion can hardly be

objectionable, although an expert's expression of that opinion before a fact finder may be objectionable under the Nebraska Evidence Rules. Second, an objection on the ground of insufficient foundation is a general objection. See *Kennedy v. Woods*, 131 Neb. 217, 267 N.W. 390 (1936). "The objection 'lack of foundation' is employed at trial in reference to many different situations." M. Graham, Handbook of Federal Evidence § 611.9 at 528 (2d ed. 1986). "If a general objection is overruled the objecting party may not complain on appeal unless: (1) The ground for exclusion was obvious without stating it, or (2) the evidence was not admissible for any purpose." *Gateway Bank v. Department of Banking*, 192 Neb. 109, 112, 219 N.W.2d 211, 213 (1974).

In Sherard's case, the ground for exclusion is unspecified, unclear, and may have related to qualifications of an expert witness or some other aspect in the introduction of opinion evidence. Kincaid's opinions had probative value regarding a fact of consequence, namely, Sherard's disability or loss of earning capacity. There is no merit to the Fund's contention concerning Kincaid's opinions presented to the trier of fact, the Nebraska Workers' Compensation Court.

### SHERARD'S TOTAL DISABILITY

The Fund alleges that the Workers' Compensation Court erred in finding that Sherard is totally disabled.

Under the Nebraska Workers' Compensation Act, an employee's disability as a basis for compensation "is determined by the employee's diminution of employability or impairment of earning power or earning capacity, and is not necessarily determined by a physician's evaluation and assessment of the employee's loss of bodily function." *Heiliger v. Walters & Heiliger Electric, Inc.*, *ante* p. 459, 470, 461 N.W.2d 565, 573 (1990). See § 48-121.

In relation to "total disability" under § 48-121(1) and "disability partial in character" under § 48-121(2), "temporary" and "permanent" refer to the duration of disability, while "total" and "partial" refer to the degree or extent of the diminished employability or impairment of earning power or earning capacity.

As Professor Arthur Larson observes: "[T]otal disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps." 2 A. Larson, The Law of Workmen's Compensation § 57.51(a) at 10-164.68, 164.68(18)(1989).

*Heiliger, supra* at 470-71, 461 N.W.2d at 573-74. An employee who is injured to the extent that the employee cannot perform services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for the services is nonexistent may be classified as totally disabled. *Lee v. Minneapolis Street Railway Co.*, 230 Minn. 315, 41 N.W.2d 433 (1950). Also, according to Professor Arthur Larson, "Compensable disability is generally defined as inability, as the result of a work-connected injury, to perform or obtain work suitable to claimant's qualifications and training." 2 A. Larson, The Law of Workmen's Compensation § 57.22(a) at 10-129 (1989). Hence, the test for a worker's employability after a compensable injury is whether the worker can compete in the open and normal labor market for the worker's services.

Whether a claimant has sustained disability which is total or partial and which is temporary or permanent is a question of fact. *Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 412 N.W.2d 469 (1987); *Ceco Corp. v. Crocker*, 216 Neb. 692, 345 N.W.2d 20 (1984).

Restatement of all the evidence bearing on the question of Sherard's disability or her loss of earning capacity would serve no useful purpose. Suffice it to say, the evidence supports the compensation court's finding concerning Sherard's disability, its degree, and duration under the circumstances.

VOCATIONAL REHABILITATION

The Fund also contends that the Workers' Compensation Court erred in failing to determine whether Sherard should enter a program of vocational rehabilitation.

Neb. Rev. Stat. § 48-162.01 (Reissue 1988), which specifically addresses vocational rehabilitation, provides:

> (3) . . . When as a result of the injury an employee is unable to perform work for which he or she has previous training or experience, he or she shall be entitled to such vocational rehabilitation services, including retraining and job placement, as may be reasonably necessary to restore him or her to suitable employment. If such services are not voluntarily offered and accepted, the Nebraska Workers' Compensation Court or any judge thereof on its or his or her own motion, or upon application of the employee or employer, and after affording the parties an opportunity to be heard by the compensation court or judge thereof, may refer the employee to a qualified physician or facility for evaluation and report of the practicability of, need for, and kind of service, treatment, or training necessary and appropriate to render him or her fit for a remunerative occupation . . . .
>
> . . . .
>
> (6) Whenever the Nebraska Workers' Compensation Court or judge thereof determines that there is a reasonable probability that with appropriate training, rehabilitation, or education a person who is entitled to compensation for total or partial disability which is or is likely to be permanent may be rehabilitated to the extent that he or she will require less care and attendance or to the extent that he or she can become gainfully employed or increase his or her earning capacity and that it is for the best interests of such person to undertake such training, rehabilitation, or education . . . .

Whether vocational rehabilitation is for an employee's best interests is a question of fact and is a statutory prerequisite to an order for vocational rehabilitation. *Pollock v. Monfort of Colorado*, 221 Neb. 859, 381 N.W.2d 154 (1986). Although the compensation court's silence on vocational rehabilitation for

Sherard might be interpreted as the court's conclusion that vocational rehabilitation is pointless at the present, especially in view of Sherard's physical condition and her previous unsuccessful efforts at rehabilitation, we need not remand to the Nebraska Workers' Compensation Court for an express finding on the question whether vocational rehabilitation is in Sherard's best interests. If the Fund believes that vocational rehabilitation is still an issue in Sherard's case, § 48-162.01(3) provides a procedure if rehabilitation services "are not voluntarily offered and accepted." Consequently, the Fund may apply to the Nebraska Workers' Compensation Court for a specific and express determination of the vocational rehabilitation question regarding Sherard. Our remand to the Nebraska Workers' Compensation Court for consideration of Sherard's vocational rehabilitation would be nothing more than an order for additional proceedings which are already available pursuant to the Fund's application under § 48-162.01(3). Hence, in the present appeal we need not consider any question regarding vocational rehabilitation.

## ATTORNEY FEES

In *Pollard v. Wright's Tree Service, Inc.*, 212 Neb. 187, 195, 322 N.W.2d 397, 403 (1982), this court stated:

> In this court it is contended that no attorney fees can be allowed to plaintiff's attorney because only the Second Injury Fund appealed and the statute refers only to the "employer." The Second Injury Fund, within the meaning of § 48-125, is an employer, and if, on appeal to this court, it fails to obtain any reduction in the amount of the award of the Workmen's Compensation Court on rehearing, the employee is entitled to a reasonable sum as attorney fees in this court, to be assessed against the Second Injury Fund.

Since the Fund has failed to reduce the amount of Sherard's award reviewed in this appeal, we order the Fund to pay Sherard $1,500 to be applied toward the fee of Sherard's lawyer for services in this court. See Neb. Rev. Stat. § 48-125(1) (Reissue 1988) (attorney fee for employee when employer appeals and fails to obtain a reduction of an award to the employee).

## CONCLUSION
The award of the Nebraska Workers' Compensation Court is supported by the evidence, is not clearly erroneous, and is, therefore, affirmed.

AFFIRMED.