JUDY SKOMAL, APPELLEE, v. WORLD OF FOOD, APPELLANT.

570 N.W.2d 542

Filed October 21, 1997.   No. A-97-044.

Walter E. Zink II and Darin J. Lang, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellant.

Richard J. Dinsmore and William G. Garbina for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

World of Food appeals from a decision of the Workers' Compensation Court finding that Judy Skomal was permanently and totally disabled. For the reasons set forth below, we affirm.

## BACKGROUND

*Injury.*

In October 1982, Skomal was working as a checker for World of Food when she injured her back lifting a pumpkin. At the time the accident, Skomal was making $4.40 an hour and working approximately 30 hours a week. Skomal was almost 40 years of age when her injury occurred.

*Medical Treatment and Surgeries.*

For more than a decade following this injury, Skomal was unable to work because of the intense pain she suffered. During this time, Skomal had at least eight surgeries on her back, including a hemilaminectomy and disk excision at L4-5, and fusions in L3-4 and L5-S1. One of the fusions involved the placement of "pedicle screws" and "VSP plates." In some of the later surgeries, the "VSP pedicle screw system" was removed and the L4-5 site was reexplored.

In addition to these operations, Skomal has had surgery on her back for the insertion of spinal cord stimulators and has also had a tendon released in her hip in an attempt to stop the pain. In November 1994, Skomal was visiting a friend at Immanuel

Medical Center, when she unexpectedly saw Dr. Antonio Manahan. Manahan, a physician referred by World of Food's insurance company, had previously treated Skomal. Manahan informed Skomal that he had been thinking about her because he had a new procedure that he thought might help her. The procedure involved injections of steroids. Medical bills show that Skomal received injections from the end of November 1994 through February 1995.

Shortly after this, Skomal went to see a Dr. Riverro, who was referred by Manahan, because the injections failed to provide Skomal any relief. Skomal testified that Riverro "was attempting to go through the scar tissue . . . in [her] back to get to the point where the nerves c[a]me out of [her] spinal column in order to free up those nerves so that [she] wouldn't have the continuous pain . . . ." The surgery proved unsuccessful because there was too much scar tissue. Riverro informed Skomal that in 2 years he would like to attempt another procedure that he believed might help her. The record is unclear as to why Riverro did not want to attempt the procedure at that time or what the procedure involved.

Although some of the surgeries provided temporary relief, Skomal still requires daily pain medication. Skomal receives her medication under the supervision of Dr. Robert McQuillan of the pain control center at St. Joseph Hospital. Because some of the drugs Skomal has been on are narcotics and are addictive, she cannot take them for an extended period. When the doctors have taken Skomal off some of these drugs, she has exhibited symptoms of withdrawal. At the time of trial, Skomal was taking methadone.

Approximately 6 months after the injury, Skomal began experiencing severe headaches. The headaches are worse when Skomal is suffering from back pain and frequently develop into migraines. Skomal sees Dr. John Donaldson, who is licensed in both medicine and psychiatry, for the headaches and the depression she suffers as a result of her back pain. Skomal takes Imitrex injections or Imitrex pills for her headaches, as well as medication for depression.

*Employment.*

In recent years, Skomal and Donaldson began discussing the possibility that Skomal might try to find employment. Skomal testified that she had essentially depleted her savings and was "basically on the point of bankruptcy," and she thought that if she got a job it would help to reduce the stress of home pressures and possibly provide a diversion from her pain.

Initially, Skomal obtained a job with an endodontist. Although the record is unclear, this apparently was in late 1993 or early 1994. A week later, Skomal was fired from this job. According to Skomal, the doctor informed her that she

> was the nicest, kindest person he had ever met, but this job he was going to have to let me go, and I was in so much pain that it was hard for me to concentrate on working but I wanted to so badly, but he just said he had to let me go.

Subsequently, Skomal obtained a receptionist's position at a beauty school. Skomal worked there for approximately 9 weeks before she was fired. The termination report stated that Skomal was a loyal and hardworking employee, but her lack of training prevented her from being effective in the job. Skomal testified that she was unable to do the job because she was in so much pain.

After Skomal was fired from the job at the beauty school, a family friend, Dr. John Merritt, gave her a job as a receptionist in his dental office. Merritt was semiretired when he hired Skomal, and he did not work regular hours. Skomal testified that she worked anywhere from 2 to 20 hours a week, depending on when Merritt needed her. Skomal testified that Merritt was "just the best" and that he would let her go home if she had a migraine or was in a lot of pain. If Skomal was scheduled to come in and was not feeling well, Merritt would tell her not to come in. Skomal left this job after Merritt suffered a heart attack and cut his hours back even further.

Skomal was subsequently hired as a receptionist at another dental office. On Skomal's job application, she indicated that she had a "bad back . . . but no problem sitting." This job lasted 5 days, until Skomal was fired. Again, Skomal testified that her firing was related to the pain she had.

This brings us to the job which is at the center of this appeal. On May 2, 1995, Skomal began working as a cashier for ShopKo. Skomal testified that she knew the ShopKo managers because she had gone there for years to get her medication. Skomal testified that she is very outgoing and that when she would come in, the managers would talk to her. The managers kept telling Skomal that when she got better, they would hire her. After being fired from the dental office, Skomal decided to take them up on their offer.

At the time she applied for the job, Skomal informed the manager that she needed to have a stool so she could sit when necessary and that she could not work a lot of hours. The manager agreed to provide a stool for Skomal, and he limited the areas in the store that she worked so that she would not have to do any lifting. Skomal primarily works as a cashier, although occasionally she does some light stocking. Other employees are not provided stools and are required to work throughout the store. Skomal testified that if she is having problems with her back, she is allowed to take off whatever time she needs.

At the time of the hearing held July 7, 1996, Skomal was still employed by ShopKo and was earning $6.53 an hour. Skomal worked an average of 26 to 30 hours a week except during the holiday season, when she occasionally worked more than 30 hours. When Skomal was evaluated in July 1995, her evaluator commented that "[Skomal] is always willing to extend her shift to assist."

## PROCEDURAL HISTORY

The first hearing before the Workers' Compensation Court was held December 29, 1987. On April 6, 1988, the compensation court found that Skomal was temporarily totally disabled as a result of a work-related accident. World of Food filed a motion for rehearing, and on December 20, 1988, the judgment was affirmed.

On June 14, 1990, World of Food filed a petition to modify the December 1988 award. World of Food alleged that Skomal had prior work experience as a dental receptionist and was capable of returning to work in that capacity. Although not included in the record, the petition to modify indicates that

World of Food apparently submitted a rehabilitation plan "to train and refresh [Skomal] in the skills necessary for employment as a dental receptionist." World of Food further alleged that Skomal had been informed that World of Food would pay for vocational training, but Skomal did not respond. The petition was later dismissed because Skomal underwent additional back surgery.

On March 10, 1992, World of Food filed another petition to modify. The compensation court observed that since the dismissal of World of Food's 1990 petition to modify, Skomal had undergone two additional surgeries and stated that the compensation court was not persuaded by the "precious little evidence" World of Food submitted that Skomal had experienced a decrease in incapacity. In its order, the compensation court also observed that "[t]his apparently is not the first time that [World of Food] has failed unreasonably to pay certain bills," and the court ordered certain expenses paid.

On December 15, 1995, World of Food filed the current application to modify. World of Food alleged that Skomal had reached maximum medical improvement and had returned to work. World of Food further alleged that as a result of Skomal's return to work, she had experienced a decrease in incapacity. The compensation court agreed that Skomal had reached maximum medical improvement, but found that Skomal was still totally disabled. World of Food filed an application for review. On December 19, 1996, a three-judge panel affirmed the judgment of the trial court. World of Food subsequently filed the current appeal.

## ASSIGNMENT OF ERROR

World of Food's three assignments of error can be summarized as alleging that the Workers' Compensation Court erred in finding that Skomal was permanently totally disabled.

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 1993), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment,

order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Sheridan v. Catering Mgmt., Inc.*, 252 Neb. 825, 566 N.W.2d 110 (1997); *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996).

The findings of fact made by a workers' compensation judge on original hearing have the effect of a verdict and are not to be disturbed on appeal unless clearly wrong. *Zessin v. Shanahan Mechanical & Elec.*, 251 Neb. 651, 558 N.W.2d 564 (1997); *Hale v. Standard Meat Co.*, 251 Neb. 37, 554 N.W.2d 424 (1996).

## ANALYSIS

The trial court found that

> [Skomal's] physical limitations would not permit her to perform on a full-time basis the duties required of her in [her] prior employments. . . . [Skomal] is able to hold her present position with Shopko only because of the beneficence of the local Shopko management, because [Skomal] is permitted to use a stool in her position as a cashier so that she can alternate between sitting and standing, and because [Skomal] is not called upon to perform the other duties that other cashiers are called upon to perform.

Accordingly, the court found that Skomal was permanently and totally disabled.

Citing *Thinnes v. Kearney Packing Co.*, 173 Neb. 123, 112 N.W.2d 732 (1962), World of Food alleges that "[a] worker who is capable of obtaining and performing remunerative employment, and in fact has returned to such employment, cannot be totally disabled as a matter of law." Brief for appellant at 9. However, World of Food recognizes that the Nebraska Supreme Court has held that it is possible for an employee to return to work and yet remain permanently totally disabled.

In *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990), the employee, Heiliger, who was also a shareholder and president of the employer, Heiliger Electric, injured his back while lifting 100 pound spools of copper wire. Heiliger immediately returned to work, but was no longer able to perform any manual labor and could not stand on

his feet for any significant length of time. Approximately 1½ months later, Heiliger's doctor performed a hemilaminectomy. After about 4 months, it became evident that Heiliger could no longer perform the work as he had before the accident, so he left the company's employment and sold his shares in Heiliger Electric to Walters, the company vice president.

Two of the medical experts concluded that Heiliger's injury, combined with a preexisting condition, resulted in a 10- to 20-percent disability. The Workers' Compensation Court found that Heiliger had sustained a 20-percent permanent partial disability to the body as a whole and also awarded him compensation for 8 weeks' temporary total disability. On appeal, the employer argued, inter alia, that the compensation court erred in finding that Heiliger was temporarily totally disabled for 8 weeks because Heiliger continued to work during that time, earning the same salary he had before the accident. The Supreme Court held that "an employee's return to work does not in every case terminate an employee's total disability from a work-related injury and does not preclude a finding that the employee's total disability continues notwithstanding the return to work." *Id.* at 471, 461 N.W.2d at 574.

" 'Total disability' in compensation law is not to be interpreted literally as utter and abject helplessness." 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 57.51(a) at 10-283 (1997).

> [T]otal disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.

*Id.* at 10-288 and 10-329. See, also, *Schlup v. Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992); *Sherard v. Bethphage Mission, Inc.*, 236 Neb. 900, 464 N.W.2d 343 (1991); *Heiliger v. Walters & Heiliger Electric, Inc., supra.*

In *Schlup,* the plaintiff, Schlup, worked on the sewing assembly line of the defendant, Auburn Needleworks. Schlup began experiencing numbness in her fingers and shooting pain in both arms. Doctors diagnosed Schlup's condition as bilateral carpal tunnel syndrome and performed surgery on both of Schlup's wrists. Six months later, Schlup was given a medical release to return to work. After 1 day of work, Schlup's hands began to swell and the pain restricted Schlup's ability to function. Doctors subsequently diagnosed Schlup's condition as reflex sympathetic dystrophy.

Nearly a year after the surgeries, Schlup was again released for work but was restricted from lifting anything in excess of 10 to 15 pounds. The doctor's restrictions also required that Schlup avoid repetitive motion. These restrictions precluded Schlup from returning to her former position. In addition, Schlup suffered from degenerative disk disease. Because of the back pain, Schlup was unable to sit for extended periods of time.

From 1988 through 1990, Schlup underwent occupational and rehabilitation therapy. Aptitude tests performed on Schlup indicated that her learning ability was well below average. Schlup filed a workers' compensation claim alleging that the carpal tunnel syndrome rendered her permanently totally disabled. The Workers' Compensation Court agreed, and Auburn Needleworks appealed.

In affirming the decision of the compensation court, the Supreme Court emphasized that Schlup had few appreciable skills, could not sit for long periods of time, and could no longer earn a living with her hands. Accordingly, the court determined that Schlup's case fell within the "odd-lot" doctrine. The court explained that " '[u]nder the odd-lot doctrine, which is accepted in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market.' " 239 Neb. at 865, 479 N.W.2d at 448 (quoting 2 Arthur A. Larson, The Law of Workmen's Compensation § 57.51(a) at 10-164.68 (1989)). See, also, *Sherard v. Bethphage Mission, Inc., supra* (holding that test for employability is whether worker can compete in open and normal labor market for worker's services).

In the present case, World of Food argues that Skomal cannot be totally disabled because at the time of the hearing, she had been working at ShopKo for over a year. However, World of Food completely ignores the fact that Skomal was fired from three jobs because of incompetence. According to Skomal, she was unable to concentrate on the job because she was in so much pain. Besides ShopKo, the only other job Skomal has been able to maintain in the 14 years since her accident was working for Merritt, who was a longtime friend of Skomal's.

Skomal testified that she had successfully completed a dental assistant course at Omaha Technical High School; however, Dr. John Brantigan opined that Skomal can no longer perform this type of work because of her injury. Although it appears that Skomal may have participated in some vocational analysis, there is nothing in the record to indicate what jobs, if any, she can perform given her age and the level of her educational and physical limitations.

In a letter dated January 24, 1994, Brantigan opined that Skomal had reached maximum medical improvement and stated that he "believe[s] that she warrants a 100 percent permanent physical impairment due to her back." Brantigan noted that Skomal can no longer do the dental hygiene work for which she had been previously trained and cannot do any type of manual labor. Brantigan further observed that Skomal "has an approximately 30 minute sitting limitation and a 30 minute standing limitation." Brantigan also noted that Skomal will be unable to do any type of bending or lifting and that her total activity during a day should be less than 2 hours.

The deposition of Donaldson was also introduced into evidence. Donaldson is licensed to practice both medicine and psychiatry. Subsequent to Skomal's accident, Donaldson began treating Skomal for depression and for the pain she suffered from her headaches. Donaldson explained that Skomal gets severe headaches when she is up and doing things and that even a normal shopping trip with her daughters can precipitate one of these headaches.

Donaldson had seen Skomal several weeks before his March 11, 1996, deposition. When counsel for World of Food asked

Donaldson whether, in his opinion, Skomal is capable of working as a cashier at ShopKo as long as she can tolerate the pain, Donaldson replied:

Certainly psychiatrically she is . . . . I know the pain issue and the secondary headache issue is . . . what could be limiting and, yeah, I think if the pain is manageable, she can do it. Now, the question is, could she be substantially gainfully employed. Can she do it full time? Could she really support herself? And that's what I'm uncertain about, whether she could really take over and be the sole support of herself if that were necessary.

During cross-examination, Donaldson explained that

[Skomal] can do a little bit and be on her feet for awhile, but then the pain begins to build, but after she tolerates so much back pain, there's the secondary headache pain, and the combination of those two are [sic] typically enough to put her in bed and to miss things that she would otherwise enjoy doing . . . .

▇ Whether a plaintiff in a Nebraska workers' compensation case is totally and permanently disabled is a question of fact. *Schlup v. Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Scott v. Pepsi Cola Co.*, 249 Neb. 60, 541 N.W.2d 49 (1995). An appellate court is precluded from substituting its view of the facts for that of the compensation court if the record contains evidence to substantiate the factual conclusions reached by the compensation court. *Wilson v. Larkins & Sons*, 249 Neb. 396, 543 N.W.2d 735 (1996). In testing the sufficiency of the evidence to support the findings of fact, the evidence must be considered in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996); *Larson v. Hometown Communications, Inc.*, 248 Neb. 942, 540 N.W.2d 339 (1995).

In the instant case, in affirming the judgment of the trial court, the three-judge panel of the Workers' Compensation Court aptly summed this case:

> The Court on review as well as the trial court is presented in this case with an admittedly unusual factual circumstance in that the plaintiff, in spite of eight back surgeries and a debilitating ongoing level of pain, has returned to work at a wage exceeding the wage she was earning at the time of her injury in 1982. However, [the trial court's] opinion recognizes but for the benevolence of her present employer, plaintiff's desire to make a financial contribution to her family and her superhuman efforts to work, plaintiff would be unable to work.

We agree.

World of Food argues that the compensation court erred in finding that ShopKo was acting out of "sympathy or pity" for Skomal when it supplied her with a stool to sit on because the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 through 12117 (1994), requires employers to make reasonable accommodations for employees with disabilities.

Assuming that World of Food is correct that the ADA required ShopKo to *accommodate* Skomal's disability, we do not believe the ADA required ShopKo to *create* a job to accommodate Skomal's disabilities. This is essentially what was done here. Skomal testified that the manager at ShopKo is very sympathetic to her injuries and is very careful about what Skomal is allowed to do. Although other employees are required to work throughout the store, Skomal's duties are essentially limited to those of cashier. The manager allows Skomal whatever time off she needs for her back, and Skomal believes that if the current manager ever leaves ShopKo, she probably would not have a job. Given Skomal's employment history since her accident, this is certainly not an unrealistic observation.

## CONCLUSION

As stated above, the essence of the test for permanent total disability is the probable dependability with which a claimant can sell his services in a competitive labor market. At the time of the hearing, Skomal was 52 years of age, and up until the

ShopKo job, Skomal had not been substantially gainfully employed for more than a decade. That she has sought employment and convinced an employer to, in essence, create a specialized job just for her with "flexibility" virtually unknown in today's job market is commendable. It is only through her own Herculean efforts and the kindness of her employer that she has been able to maintain this job.

While the arguments of World of Food are somewhat convincing, the bottom line is that the issue of whether an employee is permanently totally disabled is a question of fact, and we cannot say that the Workers' Compensation Court's finding was clearly erroneous. For the foregoing reasons, we affirm.

Pursuant to Neb. Rev. Stat. § 48-125 (Reissue 1993), an award of attorney fees to Skomal is appropriate, and the same will be made upon the filing of a motion in compliance with Neb. Ct. R. of Prac. 9F (rev. 1996).

AFFIRMED.